## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| SPHERATURE INVESTMENTS LLC, *et al.*[1] | Lead Case No.: 20-42492 |
| Debtor. | Adv. Case No.: 21-xxxxx |

_____/

MELODY YIRU, on behalf of herself and those similarly situated,

               Plaintiffs,

SPHERATURE INVESTMENTS LLC, WORLDVENTURES MARKETING HOLDINGS, LLC, WORLDVENTURES MARKETPLACE, LLC, WORLDVENTURES MARKETING, LLC, and WORLDVENTURES SERVICES, LLC, DOES 1-1000,

               Defendants.

_____/

## **COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND DAMAGES**

---

[1] The "Debtors" in the above-captioned jointly administered chapter 11 bankruptcy cases ("Cases") are: Spherature Investments LLC ("Spherature") EIN#5471; Rovia, LLC ("Rovia") EIN#7705; WorldVentures Marketing Holdings, LLC ("WV Marketing Holdings") EIN#3846; WorldVentures Marketplace, LLC ("WV Marketplace") EIN#6264; WorldVentures Marketing, LLC ("WV Marketing") EIN#3255; WorldVentures Services, LLC ("WV Services") EIN #2220.

I.    **INTRODUCTION TO THE CASE**

1.    As the Federal Trade Commission has again enunciated, evidence of a pyramid scheme comes in the form of both design as well as practice.  *FTC v. James Noland et al.*, Case No. 2:20-cv-00047-DWL, Dkt. No. 105 (D. Ariz. February 16, 2020).  The compensation plan, the commission documents, the supposed terms and conditions, and the Defendants' marketing materials and websites reflect the *design* of a pyramid scheme.

2.    So too, is WorldVentures a pyramid scheme in practice.  Here, a large predominance of the purchases was by individuals who are affiliates within the program. Thus, the overwhelming volume of individuals are purchasing for the business opportunity and not strictly for the retail product.  Finally, the FTC speaks of the "loss position," i.e., do a substantial number of those who have joined the organization, pay more than they receive back from the company. Here, at minimum 96% of the representatives of WorldVentures are in a "loss position."

3.    Plaintiff's position was further confirmed by FTC Commissioner Noah Phillips, former Chief Counsel to U.S. Sen. John Cornyn (Tex.). *Keynote Remarks of Commission Phillips at the DSA Legal & Regulatory Summit* (October 15, 2020).   https://www.ftc.gov/public-statements/2020/10/keynote-remarks-commissioner-phillips-dsa-legal-regulatory-summit.    As stated by Commissioner Phillips: "this past year has been an active one for the FTC on many fronts, but with respect to activities involving illegal multi-level marketing. Sellers beware; we've been aggressive in the cases we've been pursuing, the remedies we're seeking, and our willingness to go to court. Some watching today may not like everything we've been doing, and I regret that my remarks are unlikely to put them at ease."  The complete remarks are attached hereto as **Exhibit 1**.

4.    WorldVentures represented to Plaintiff Melody Yiru that she could "make a lot of money," "double your profits," and make an extra $20,000 by recruiting others to become WorldVentures "sales representatives."    Plaintiff and members of the class all joined WorldVentures and became "sales representatives."

5.      However, Plaintiff did <u>not</u> make money as promised. Like the hundreds of thousands of WorldVentures representatives before and after her, Plaintiff failed. Plaintiff and the class failed even though they were committed and put in the time and effort. They failed because they were doomed from the start by a WorldVentures marketing plan that systematically rewards recruiting representatives over sales of travel packages, and WorldVentures is nothing more than a site that compiles travel package plans from the website (often at prices significantly in excess of what a consumer can obtain from Expedia). Only 3% of the members of WorldVentures will see a profit, according to WorldVentures own statistics.

6.      Defendants run an illegal pyramid scheme. Defendants have been banned from operating in Norway based on the Court system there finding that they were operating an illegal pyramid scheme.  Defendants take money in return for the right to sell travel membership services and the right rewards for recruiting other participants into the pyramid.

7.      On July 30, 2021, Plaintiff filed a proof of claim against each of the Debtors with the Claims Agent, Stretto.  Plaintiff seeks to join these claims to this Adversary Proceeding by virtue of the Federal Rules of Bankruptcy Procedure.

8.      Accordingly, Plaintiff, for herself, and all others similarly situated, and the general public, allege:

II.     **TYPE OF ACTION**

9.      Plaintiff sues for herself and for all persons who were WorldVentures representatives from May 1, 2013 until the present under California's Endless Chain Scheme Law (California's Penal Code § 327 and California Civil Code § 1689.2), California's Unfair Competition Law (Business and Professions Code §17200 et seq.); False Advertising Law (Business and Professions Code §17500), and Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*. against all defendants for the operation and promotion of an inherently fraudulent endless chain scheme.

10.     Plaintiff also brings a declaratory relief Count that the entire contract is illusory, and thus a purported "choice of law" provision is not enforceable.

III.   **PARTIES**

11.     Plaintiff Melody Yiru aka Shi Yiru is and at all relevant times was an individual who resided in Los Angeles County, California. Yiru became an WorldVentures representative in September of 2015. Plaintiff was deceived by WorldVentures' misleading opportunity believing the opportunity was a legitimate way to earn money (even though that was false), and Plaintiff Yiru did in fact lose money as a result of Defendants' unfair, unlawful, and fraudulent business practice. Yiru's injuries arise from the predicate acts themselves in that she provided a monthly payment to WorldVentures for over a year, she put significant effort into the opportunity, the WorldVentures entities were destined to fail as an illegal Ponzi scheme and pyramid scheme, and the money Yiru placed into the scheme was used by the Debtors and other DOE Defendants as later defined, to live lavish life styles, and was reinvested in the business to create an air of propriety including office space, lavish trips, and conferences.  Since Yiru's money went into the use or investment by Defendants as racketeering income, Plaintiff was injured.

12.     Yiru paid WorldVentures a start-up amount of $510.92 on or around of September of 2015, and then monthly amounts ranging between $110.98 and $114.98 per month from October 1, 2015 to April 4, 2017, totaling $2,675.00.  Yiru was recruited by WorldVentures, the defendants and her upline Meihong Liu.  She was told that the only way to earn money was to recruit others.

13.     WorldVentures and the Debtors and other DOE Defendants who created, countenanced, and pedaled the marketing program, broadcasted a marketing presented that represented to Yiru that WorldVentures was a "home-based business with low overhead and $150 million in revenue."  Further the presentation falsely stated that "for every $199 sale, you receive $20."  This representation suggestively suggested and implied that a "sale" was possible, when in reality the mentioning of "sale" meant in practice the recruitment of a new representative.

14.     WolrdVentures and the Individuals Defendants state that an "average bonus" of $1,500 can be made, stating that 90 customers will be in the left line and 90 customers in the right

line.  To effectuate these representations, WorldVentures depicts a picture that appears to be an endless chain.  The representation of customers with the chain is false because if a person is recruited within the network and signs up as a representative and below the participant in the chain, the person cannot be charactered as a "customer."

15.     WorldVentures Holdings, LLC, is a limited liability company under the laws of Nevada with its principal place of business in Nevada ("WV II").

16.     WorldVentures, LLC ("WV") is a Nevada limited liability company that is part of the corporate family of WorldVentures, and responsible for the acts alleged in this Complaint. WV, at all times relevant in this Complaint, did business in the State of California.

17.     WorldVentures Marketing, LLC ("WorldVentures") is another company that is part of the corporate family of WorldVentures, as is responsible for the acts alleged in this complaint. WorldVentures, at all times relevant s in this Complaint, did business in the State of California.

III.     **PARTIES, <u>JURISDICTION, AND VENUE</u>**

18.     Plaintiff Melody Yiru aka Shi Yiru is and at all relevant times was an individual who resided in Los Angeles County, California. Yiru became a WorldVentures representative in September of 2015. Plaintiff was deceived by WorldVentures' misleading opportunity believing the opportunity was a legitimate way to earn money (even though that was false), and Plaintiff Yiru did in fact lose money as a result of Defendants' unfair, unlawful, and fraudulent business practice. Yiru's injuries arise from the predicate acts themselves in that she provided a monthly payment to WorldVentures for over a year, she put significant effort into the opportunity, the WorldVentures entities were destined to fail as an illegal Ponzi scheme and pyramid scheme, and the money Yiru placed into the scheme was used by the Debtors and other DOE Defendants as later defined, to live lavish life styles, and was reinvested in the business to create an air of propriety including office space, lavish trips, and conferences.  Since Yiru's money went into the use or investment by Defendants as racketeering income, Plaintiff was injured.

19.     Spherature, LLC is a Limited Liability Company which is the successor entity to WorldVentures Marketing.

20.     WorldVentures Marketing Holdings, LLC is a Limited Liability Company whose sole member is WorldVentures Holdings, LLC.

21.     WorldVentures Marketplace, LLC is a Limited Liability Company whose sole member is WorldVentures Holdings, LLC.

22.     WorldVentures Marketing, LLC is a Limited Liability Company whose sole member is WorldVentures Holdings, LLC.

23.     WorldVentures Services, LLC is a Limited Liability Company whose sole member is WorldVentures Holdings, LLC.

24.     WorldVentures Holdings, LLC is a Limited Liability Company with a variety of individual members.

25.     This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper under 28 U.S.C. § 1409.

26.     This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

IV.     **FACTS**

A.      **Debtors Operate a Pyramid Scheme That Was Banned in Norway**

27.     WorldVentures was founded in 2005 and purports to operate in 28 countries. In 2015, WorldVentures had what it describes as 238,684 "sales representatives." In 2015, WorldVentures claimed to have earned $650 million in revenue. In 2017, WorldVentures estimated it would have $1 billion dollars in revenue, and claims it has 700,000 sales representatives. WorldVentures operates in California, does business in California, and holds seminars in California to woo its latest victims. WorldVentures does not actually originate travel packages.

28.     Former Advisors of WorldVentures have disclosed publicly that from 2013 to 2015, WorldVentures continued to experience a significant amount of negative publicity specifically as to whether the company was a pyramid scheme. Former advisors were brought into assist with these issues, but the company remains a pyramid scheme. There were further problems that the exponential growth of WorldVentures' business in certain countries in Asia was due to inadequate

oversight of sales representatives conducting business without WorldVentures having first obtained the required business license in each respective country.

29.    In May 2013, the Norwegian Gaming Board announced an investigation into WorldVentures' business activities.

30.    In February of 2014, the Country of Norway banned WorldVentures from the Country of Norway and concluded that WorldVentures' business program constitutes an illegal pyramid scheme because revenue almost exclusively comes from recruiting members and not the sale of travel residence.  In other words, the proceeds of WorldVentures stem from recruiting new participants into the business.

31.    WorldVentures appealed the Country of Norway's ruling, which WorldVentures' lost in November of 2014.  In February of 2016, WorldVentures sued the Norwegian Ministry of Culture. On or about October of 2016, the lawsuit against the Norwegian Ministry was affirmed. The Norway Court most recently concluded that WorldVentures' revenue was generated from recruitment of affiliates and "not from the consumption of sale of goods, services or any other arrangement."  The Norwegian Court concluded WorldVentures looked like a pyramid scheme that had been previously ruled on in 2014.

32.    Rewards paid in the form of cash bonuses, where primarily earned for recruitment, as opposed to merchandise sales to consumers, constitute a fraudulent business model. *See F.T.C. v. BurnLounge, Inc.*, 753 F.3d 878 (9th Cir. 2014).

B.    **How Debtors Perpetuate their Pyramid Scheme and Ponzi Scheme**

33.    The Debtors conduct a Ponzi/pyramid scheme, not a legitimate MLM.

34.     Pyramid schemes and Ponzi schemes share many similar characteristics and typically involve unsuspecting participants who are duped into paying money to join the scheme by unscrupulous operators promising extraordinary returns. In contrast to a legitimate investment, however, these types of schemes can only provide the promised returns if the number of participants continues to increase exponentially, as the money from later participants is the sole or primary source available to make payments to existing participants. *Webster v. Omnitrition Int'l,*

*Inc.*, 79 F.3d 776, 781 (9th Cir. 1996); *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 479 (6th Cir. 1999); *In re First Commercial Mgmt. Grp., Inc.*, 279 B.R. 230, 232 (Bankr. N.D. Ill. 2002); *Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615, 630 (Bankr. S.D. Ohio 2006); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 439, 470 (Bankr. S.D.N.Y. 2015).

35.    A Ponzi scheme is generally based upon a fraudulent investment opportunity. Typically, investors contribute funds to the organizer who promises a high return. Existing investors are paid their returns almost exclusively from the funds contributed by new investors and not from the legitimate profits of the business. *Bear, Stearns Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 8 (S.D.N.Y. 2007); *Eberhard v. Marcu,* 530 F.3d 122, 132 n.7 (2d Cir. 2008); *accord In re Bernard L. Madoff Inv. Secs. LLC*, 654 F.3d 229, 232 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 25 (2012); *see United States v. Moloney*, 287 F.3d 236, 242 (2d Cir. 2002) ("A Ponzi scheme by definition uses the purportedly legitimate but actually fraudulently obtained money to perpetuate the scheme, thus attracting both further investments and, in many cases, new investors to defraud."), *cert. denied*, 537 U.S. 951 (2002).

36.    Some courts have discussed a four-factor test to determine whether a Ponzi scheme exists: 1) deposits were made by investors; 2) the debtor conducted little or no legitimate business operations as represented to investors; 3) the purported business operation of the debtor produced little or no profits or earnings; and 4) the source of payments to investors was from cash infused by new investors. *Armstrong v. Collins*, 2010 WL 1141158, at \*22 (S.D.N.Y. Mar. 24, 2010)(quoting *Forman v. Salzano (In re Norvergence, Inc.)*, 405 B.R. 709, 730 (Bankr. D.N.J. 2009) (*quoting In re Canyon Sys. Corp.*, 343 B.R. at 630); *accord Carney v. Lopez*, 933 F. Supp. 2d 365, 379 (D. Conn. 2013); *Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, 1312 (M.D. Fla. 2009); *Kapila v. TD Bank, N.A. (In re Pearlman)*, 440 B.R. 900, 904 (Bankr. M.D. Fla. 2010); *Floyd v. Dunson (In re Ramirez Rodriguez)*, 209 B.R. 424, 431 (Bankr. S.D. Tex. 1997).

37.    Other courts have identified badges that weigh in favor of finding a Ponzi scheme, including the absence of any legitimate business connected to the investment program, the unrealistic promises of low risk and high returns, commingling of investor money, the use of agents

and brokers that are paid high commissions to perpetuate the scheme, misuse of investor funds, the "payment" of excessively large fees to the perpetrator and the use of false financial statements. *See In re Dreier LLP,* 2014 WL 47774, at p. 9 (Bankr. S.D.N.Y. 2014). These badges are, however, merely characteristics of many Ponzi schemes but a Ponzi scheme can exist without all of them. *Id.* At bottom, the label Ponzi scheme applies "to any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud." *In re Manhattan Inv. Fund*, 397 B.R. at 12 (quoting *Bayou Superfund v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC)*, 362 B.R. 624, 633 (Bankr. S.D.N.Y. 2007) ("*Bayou I*")); *see Armstrong*, 2010 WL 1141158 at * 23 ("[E]ven assuming Yagalla did not promise or represent high rates of return, this does not mean that he was not running a Ponzi scheme. 'Case law has revealed that a clever twist on the Ponzi concept will not remove a fraudulent scheme from the definition of Ponzi.'") (*quoting In re Norvergence*, 405 B.R. at 730).

38.     A pyramid scheme is generally characterized by a participant's payment to an MLM operator in return for which participants receive the right to sell a product and the right to receive rewards for recruiting other participants substantially unrelated to the sale of product to ultimate users. *Webster*, 79 F.3d at 781(*quoting In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106 (1975)).

39.     A pyramid scheme is a type of Ponzi scheme in that, in both instances, the scheme can only be sustained by the continued influx of new investors/participants to fund amounts needed to be paid to earlier investors/participants. A Ponzi scheme generally involves only a direct, linear relationship between the owner of the scheme and the investors. The pyramid scheme, however, has two additional elements: the ostensible right to sell a product, and the payment to participants for the recruitment of new participants, thereby creating the pyramid structure.

40.     An MLM is a direct sales strategy in which members are compensated not only for sales the members generate, but also for the sales generated by other members that they recruit. Whether an MLM operates as a pyramid scheme is determined by how it functions in practice. *Whole Living*, 344 F. Supp. 2d at 745. A lawful MLM is distinguishable from a pyramid scheme

in that the primary purpose of the enterprise and its associated individuals is to sell or market an end-product to end-consumers, and not to reward associated individuals for the recruitment of more participants. *Federal Trade Commission v. SkyBiz.com, Inc.*, 2001 WL 1673645, at *28 (N.D. Okla. Aug. 31, 2001).

41.     The Debtors' compensation scheme had elements of both a Ponzi and pyramid scheme to this day.

42.     WorldVentures purports to sell travel-related services based on club membership.

43.     A significant portion, and more than 80% of WorldVentures' travel plans, do not include airfare, but instead only include hotel and lodging accommodations.   The packages contemplate a guarantee refund if travel is cheaper, but in practice, this never happens and refunds are not consummated.

44.     There are three "membership" packages for WorldVentures' consumers: "DreamTrips," "DreamTrips GOLD," and "Dream Trips PLATINUM."

45.     For "Dreamtrips," there is a $24.99 monthly fee and initial membership signup fee of $99.99 for each consumer. A member receives an initial 100 points enrollment, and 300 points annually towards travel packages.  The GOLD package requires a member to pay $199.99 initial membership fee and $49.99 per month.  The gold member receives an initial 200 points, and 600 points annually toward travel packages. Finally, the PLATINUM membership requires a consumer to pay an initial membership fee of $299.99 and $99 per month.  The platinum member receives 300 points, and 1200 points annually

46.     According to recent income disclosures that are not made, 70% of representatives do not make income, despite allegedly providing "every effort to provide training, tools, and support."  Only 3% of all representatives will receive a profit.

47.     Courts can determine as a matter of law that Debtors are operating a pyramid scheme and Ponzi scheme.

C.     **Members Receive Benefits Only Through the Performance of Those Downline to Them**

48.    If one person signs up underneath the participant through the "Platinum" membership, the upper line receives 200 points.

49.    If 4 people sign up as down lines in the Gold or Platinum membership, the monthly *membership is free,* and the member receives $300. In other words, the greater the pyramid is perpetuated by the consumer, membership becomes free. Fees are deemed waived.

50.    If 6 people sign up as down lines in the Platinum membership, a $250 bonus is given in addition to the waiver of the membership fee. If 12 people are signed up by a member, the consumer receives a free ipad3. If 20 people sign up, the consumer receives a car bonus for a silver BMW in the amount of $600 per month. This is called the "wings and wheels" program. Worldventures touts that its membership promises "fun, freedom, and fulfillment" through WorldVentures process. A member "gets a percentage of everybody who pays through your referral network, it has opportunity to stretch around the world and create substantial income." WorldVentures further claims that representatives "make a lot of money," "double your profits," and make an extra $20,000 by recruiting others to become WorldVentures "sales representatives." WorldVentures represented to Plaintiff that the real money was in becoming an associate and recruiting others to join the program.

51.    Signifying how the travel package is of no value, the packages are overpriced, under-inclusive, and are significantly in excess of the price a consumer can obtain the equivalent travel packages from almost any online competitor - Cheap Tickets, Groupon, and Expedia.

52.    WorldVentures does not have its own travel deals. It just scouts for deals and make a person pay to view them. Turn over levels are high in each members downline reflecting the nature of the scam. That is, to make money, one must constantly be recruiting new victims.

53.    Further, WorldVentures has at times given misleading information about their product to consumers prior to purchase, exaggerates the savings realized by their product and fails to provide refunds for cancelled services.

54.     According to videos from David Pietsch of WorldVentures, with World Ventures "you are at the top of your company."  WorldVentures implicitly encourages its members to keep building the pyramid.

55.     $20 commission is received for each person a member signs up.  Every time the team sells membership, this is called a cycle and a member receives $200.  "3 sales right.  3 sales, left." According to WorldVentures, it does not matter how many travel packages are sold.  All that matters is how many people are signed up in one's downline.  According to WorldVentures, the binary pays to infinity."  If a member has 60 persons in his/her downline (30 on the right, 30 on the left) that person obtains "senior membership" entitling them to $4,000-5,000 per month.  So, in effect, if a person signs up 60 people, WorldVentures takes 15-20% of the profit, and the member receives other revenues for the downlines.

56.     Some of the top reps were paying the fees for some of their downline recruits themselves in order to maintain a high rank and appearance of success.  WorldVentures props up its prominent salesperson by propping them up and grandfathering them into the highest rank in the company even though they have not earned it.  Indeed, there is a secret compensation plan.

57.     This scheme is analogous to YTB's online Travel Pyramid Scheme that California State Attorney General Brown entered a stipulated judgment to ban further operations. https://oag.ca.gov/news/press-releases/brown-ends-ytbs-online-travel-pyramid-scheme.

58.     During nearly the entire Class Period, WorldVentures did not make adequate income disclosure statement to its representatives or prospective representatives, particularly during nearly the entire time that Plaintiff Shi Yiru was a representative for WorldVentures, and the four-year class period for participants of WorldVentures.

59.     These statements are deceptive income claims regarding the financial gains consumers will achieve by becoming representatives.  For example, WorldVentures advertises that those who sign-up for its business opportunity can make over $26,000 per week.   Its representatives also make unrealistic financial promises, such as being able to make millions of dollars per year.

60.     As explained herein, WorldVentures, through its actions and omissions, intended to, and did, conceal from Plaintiff and other representatives in the class during the relevant period material facts and information relating to WorldVentures' endless chain scheme and its deceptive earnings claims. Plaintiff did not discover, nor had they reason to discover, the information necessary for the causes of action set forth in this Complaint.

61.     WorldVentures' acts and omissions constitute a "continuing violation" such that any limitations period for Plaintiff' claims did not begin to accrue until the date of the last wrong or injury that is the subject of this action.

62.     The pled facts and happenings in ¶¶ 33-61herein were made by WorldVentures and approved, authorized, ratified, promoted, and countenanced by all the Debtors, and the DOE Defendants who may be named if properly not joined to the pending District Court action.

## PLAINTIFF'S STANDING TO PROSECUTE CAUSES OF ACTION

### A. The Complaints Assert Colorable Claims

63.     The Committee refused to prosecute this action when Ms. Yiru was on the Committee claiming allowing a company to operate illegally would be sanctioned and that allowing an illicit transaction to occur was paramount to the concept of whether this business is operating illegally.

64.     A claim is colorable if "there is a possibility of success." *In re McConnell*, 122 B.R. 41, 44 (Bankr. S.D. Tex. 1989). In other words, the court examines whether the claim "on appropriate proof would support a recovery." *See In re STN Enters.*, 779 F.2d 901, 905 (2d Cir. 1985). Courts recognize this threshold as low and that "the required showing is a relatively easy one to make." *In re Adelphia Commc'ns Corp.*, 330 B.R. 364, 377 (Bankr. S.D.N.Y. 2005). Courts frequently liken the colorable claim analysis to the minimal showing required to survive a Rule 12(b)(6) motion to dismiss. *See, e.g.*, *In re ABC Utils. Servs.*, No. 89-41420-BJH-7, 2001 Bankr. LEXIS 2240, (Bankr. N.D. Tex. Oct. 9, 2001) ("[A] colorable claim is one that raises a serious question even if the claim ultimately fails to survive a Rule 12(b)(6) motion to dismiss."); *In re America's Hobby Ctr.*, 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998) ("Because the creditors'

Committee is not required to present its proof, the [colorable claim] inquiry is much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim."); *In re Racing Servs., Inc.*, 540 F.3d 892, 900 (8th Cir. 2008) ("[A] creditor's claims are colorable if they would survive a motion to dismiss.").

65.     The Complaint asserts colorable claims in that ponzi and pyramid cases are often brought by a bankrupt estates pursuant to claims for declaratory relief, and claims pursuant to 11 U.S.C. §§ 547, 548, 550. Such claims face even less hurdles than a claimant's *direct* claims, some of which were brought by Ms. Yiru in the Northern District of Texas. Given the proven nature of these claims and the banning of these operations in several geographical regions, these claims easily satisfy the minimal pleading requirements and point not only to a "possibility of success," but rather more of a certainty of success. Plaintiff will seek derivative standing as part of this Adversary Case and Bankruptcy Case to pursue any claim deemed to be derivative, and not direct.

### B. The Debtors' and Committee's Unwillingness or Inability to Pursue the Causes of Action is Unjustified

66.     Not only are the Causes of Action colorable, but they also have significant potential value and could improve the recoveries of unsecured creditors materially, outweighing any delay and cost associated with litigating the Causes of Action. The Causes of Action could result in a substantial recovery for unsecured creditors and Regulatory Claimants. More directly, the debtor has a conflict of interest. The rationale underlying a creditors' Regulatory Committee's standing to bring estate causes of action "comes into play when a debtor-in-possession has a conflict of interest in pursuing an action." *In re Cooper*, 405 B.R. 801, 809 (Bankr. N.D. Tex. 2009). Under section 704(a)(1) of the Bankruptcy Code, a debtor in possession has an obligation to pursue estate causes of action if doing so would maximize the value of the estate. *Louisiana World*, 858 F.2d at 246. When a colorable cause of action exists but the debtor unjustifiably "is unable or unwilling to fulfill its obligations—due, for instance, to a conflict of interest"—it is appropriate for a committee to be granted standing to pursue such claims. *Id.* at 252; *Cooper*, 405 B.R. at 810.

67.     A debtor's refusal to pursue an avoidance action can be implied even in the absence of a formal demand because "it cannot be said that a formal request, in order to obtain a formal refusal, a request that would surely be refused, should be required." *In re G-I Holdings*, 313 B.R. 612, 630 (Bankr. D.N.J. 2004) (internal quotations omitted); *see also In re Nat'l Forge Co.*, 326 B.R. 532, 544 (W.D. Pa. 2005) (holding that bankruptcy court was justified in concluding that debtor would have declined to file claims as debtor waived all rights to contest bank's claims through language financing orders and debtor's key employees who were named in an adversary proceeding would have faced conflicts of interest if faced with a demand to file suit). Here, the Debtors have expressly, implicitly, and publicly stated that they will not be pursuing such litigation. Accordingly, the Regulatory Committee should be granted standing to pursue the Causes of Action on behalf of the Debtors' estates.

68.     In determining whether the proposed action would benefit the estates, a court should engage in a limited merits assessment to ensure "that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that initiation and continuation of litigation will likely produce." *Adelphia*, 330 B.R. at 374. While a "sufficient likelihood" of success is difficult to quantify, it is not necessary that the court find that success is more likely than not. *Id.* at 386. A court need only assure itself that the proposed litigation is not a "hopeless fling" and that the "prospective rewards can reasonably be expected to be commensurate with the litigation's foreseeable cost." *See Adelphia*, 330 B.R. at 386. Thus, in *America's Hobby Ctr.*, the court approved the prosecution of claims by a creditors' Committee where it assessed that there was a "fair chance that the benefits to be obtained from the litigation will outweigh its costs." 223 B.R. at 284.   The Debtors have proposed unreasonable and unfair concessions to the insiders of the Debtors.

69.     Through a Motion, Plaintiff will ask that she be granted standing to pursue the Causes of Action against the Defendants to the extent any such claim is deemed derivative. To hold otherwise would cause the release of colorable claims that could be of significant value to the unsecured creditors in these cases and result in a miscarriage of justice against the true creditors

of the estate.

V.    **CLASS ACTION ALLEGATIONS**

70.    Plaintiff brings this action as a class action under Fed. R. Civ. Procedure 23.

71.    Plaintiff seeks to certify a class pursuant to Fed. R. Civ. Proc. 23(a), 23(b), 23(c)(4), and 23(c)(5), if necessary.

72.    Plaintiff seeks to represent a nationwide class defined as follows: "All persons who were WorldVentures representatives in the United States from May 1, 2013 until the present." ("Class Period").

73.    Subject to confirmation, clarification and/or modification based on discovery to be conducted in this action, Plaintiff also seek to represent a sub-class in California, defined as follows:

> "All persons who were WorldVentures representatives who enrolled with a California address from May 1, 2013 until the present."

74.    Excluded from the class are the Defendants, family members, this Court, and any "Director" of World Ventures, including without limitation the positions listed as "Director," "Marketing Director," "Regional Marketing Director," "National Marketing Director," "International Marketing Director."

75.    Plaintiff seeks relief for herself and all members of the class under California's Unfair and Deceptive Practices Acts, and California's Fraudulent Advertising Act.

76.    Plaintiff seeks to pursue a private attorney general action for injunctive relief for themselves and all members of the class who agreed to a choice of law, and they satisfy the standing and class action requirements.

77.    While the exact number of members in the Class and Subclass are unknown to Plaintiff at this time and can only be determined by appropriate discovery, membership in the class and subclasses is ascertainable based upon the records maintained by Defendant. It is estimated that the members of the Class are greater than 250,000 nationwide.

78.     Therefore, the Class and Subclasses are so numerous that individual joinder of all Class and Subclass members is impracticable under Federal Rule of Civil Procedure 23.

79.     There are questions of law and/or fact common to the class and subclasses, including but not limited to:

a.   Whether WorldVentures is operating an endless chain;

b.   Whether representatives paid money to WorldVentures for (1) the right to sell a product and (2) the right to receive, in return for recruiting others, rewards which were unrelated to the sale of the product to retail consumers;

c.   Whether WorldVentures' rules apply to Section 327 claims;

d.   If the WorldVentures rules do apply, are WorldVentures' rules effective;

e.   If the WorldVentures rules do apply, and WorldVentures' rules are effective, did WorldVentures enforce those rules;

f.   Whether WorldVentures or the Directors omitted to inform the Plaintiff and the plaintiff class that they were entering into an illegal scheme where an overwhelming number of participants lose money;

g.   Whether WorldVentures' Statements of compensation during the Class Period were deceptive and misleading;

h.   Whether WorldVentures' conduct constitutes an unlawful, unfair and/or deceptive trade practice under California state law;

i.   Whether WorldVentures' conduct constitutes unfair competition under California state law; and

j.   Whether WorldVentures' conduct constitutes false advertising under California state law in that the representations concerning price and competition of the travel packages, was false, and below industry standard given the contribution to the distributorships.

80.     These and other questions of law and/or fact are common to the class and subclass and predominate over any question affecting only individual class members.

81.     Plaintiff's claims are typical of the claims of the class and subclasses because Plaintiff was a representative for Defendant WorldVentures and lost money because of the illegal scheme.

82.     Plaintiff's class is ascertainable because each representative/distributor of WorldVentures can be identified in the computer database that WorldVentures has housed online and in Texas, since at least 2013.

83.     Plaintiff has limited the class statute of limitation period to four years from the date of original filing, which is the statute of limitations for a claim under RICO, the Unfair Competition Law, and potentially some of Plaintiff's other claims.

84.     Plaintiff has standing to challenge the improper corrective amendments made to the class wide representative agreement and will do so during the course of the case.

85.     Plaintiff will fairly and adequately represent the interests of the class and subclass. Plaintiff's claims are typical of those of the class and subclasses. Plaintiff's interests are fully aligned with those of the class and subclass. And Plaintiff has retained counsel experienced and skilled in complex class action litigation.

86.     Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged because such treatment will allow many similarly situated persons to pursue their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.

87.     Plaintiff knows of no difficulty likely to be encountered in the management that would precludes maintenance as a class action.

## <u>COUNT I</u>

### (**ENDLESS CHAIN SCHEME; California Penal Code §§ 327 and 1689.2 of the California Civil Code**)

(On behalf of the Class and the Subclass against all Defendants, including DOES 1-1000)

88.     Plaintiff reallege all allegations and incorporates previous allegations by reference.

89.     Section    1689.2    of    the    California    Civil    Code    provides: A participant in an endless chain scheme, as defined in Section 327 of the Penal Code, may rescind the contract upon which the scheme is based, and may recover all consideration paid pursuant to the scheme, less any amounts paid or consideration provided to the participant pursuant to the scheme.

90.     The Defendants are operating an endless chain scheme under Section 327 of the Penal Code because they have contrived, prepared, set up, and proposed an endless chain.

91.     The WorldVentures operations constitute a scheme for the disposal or distribution of property whereby class members, including Plaintiff, paid valuable consideration for the chance to receive compensation for introducing one or more additional persons into participation in the scheme or for the chance to receive compensation when a person introduced by the participant introduces a new participant. Specifically, Plaintiff paid a monthly amount to WorldVentures for the chance to receive compensation for introducing one or more additional persons.

92.     The WorldVentures' operation constitutes an endless chain because 99% of new distributors fail, and WorldVentures has a high attrition rate.

93.     The WorldVentures' operation constitutes an endless chain because revenues are derived primarily from recruitment as opposed to the sale of legitimate travel packages to end consumers.

94.     Almost none of the revenues Defendants has received are derived from any sale of a travel package to a person outside of the organization.

95.     Each of the Defendants are operators of the scheme.

96.     Plaintiff and the class have suffered an injury in fact and have lost money or property because of WorldVentures' operation of an endless chain, business acts, omissions, and practices.

97.     Plaintiff and the class are entitled to:

a. rescind the contract upon which the scheme is based and recover all consideration paid under the scheme, less any amounts paid or consideration provided to the participant under the scheme;

b. restitution, compensatory and consequential damages (where not inconsistent with their request for rescission or restitution); and

c. attorneys' fees, costs, pre- and post-judgment interest.

## COUNT II

**(Unfair and Deceptive Practices Claims Under Cal. Bus, & Prof. Code § 17200, *et seq.*)**

(On behalf of the Class and the Subclass against all Defendants, including DOES 1-1000)

98.     Plaintiff realleges all allegations and incorporates previous allegations by reference.

99.     All claims brought under this Second Cause of action that refer or relate to the unlawful, fraudulent, or unfair "endless chain" of Defendants are brought on behalf of Plaintiff and the Class.

100.    All claims brought under this Second Count that refer or relate to the unlawful, fraudulent, or unfair the statements, the touted WorldVentures "business opportunity" are brought on behalf of Plaintiff, the Class, and the Subclass.

101.    WorldVentures has engaged in constant and continuous unlawful, fraudulent, and unfair business acts or practices, and unfair, deceptive, false, and misleading advertising within the meaning of the California Business and Professions Code § 17200, *et seq.* The acts or practices alleged constitute a pattern of behavior, pursued as a wrongful business practice that has victimized and continues to victimize thousands of consumers.  The WorldVentures Sales and Marketing Plan Is Unlawful.

102.    Under California Business and Professions Code § 17200, an "unlawful" business practice is one that violates California law.

103.    WorldVentures' business practices are unlawful under § 17200 because they constitute an illegal "endless chain" as defined under, and prohibited by, California Penal Code § 327.

104. WorldVentures utilizes its illegal "endless chain" with the intent, directly or indirectly, to dispose of property in WorldVentures products and to convince representatives to recruit others to do the same.

105. WorldVentures' business practices are unlawful § 17200 because they violate §17500 *et seq.*, as alleged in the Third Cause of Action.

106. Under California Business and Professions Code § 17200, a "fraudulent" business practice is one that is likely to deceive the public.

107. WorldVentures' business practices are fraudulent in four separately actionable ways: (1) WorldVentures' illegal and deceptive "endless chain"; (2) the touted, yet non-existent, WorldVentures "business opportunity" for everyone, including but not limited to WorldVentures' massive advertising campaign and the misleading statements of compensation.

108. First, as detailed herein, Defendants promoted participation in the WorldVentures endless chain, which has a compensation program based on payments to participants for the purchase of product by participants, not the retail sale of products or services.

109. WorldVentures has made numerous misleading representations about the business opportunity of WorldVentures and the income that a recruit or a distributor can realize by becoming a distributor and participating in the scheme.

110. WorldVentures knew, or should have known, that the representations about the business opportunity of WorldVentures were misleading in nature.

111. As a direct result of WorldVentures' fraudulent representations and omissions regarding the WorldVentures endless chain described herein, WorldVentures wrongly acquired money from Plaintiff and the members of the classes.

112. Second, WorldVentures touted, in numerous different ways as part of a massive advertising campaign, a "business opportunity," which WorldVentures also repeatedly and in many ways represented, among other things, as being "for everyone" and allowing "full time" or "part time" opportunities.

113.    The massive advertising campaign included among other things, the website, emails, websites, presentations by WorldVentures, training, word of mouth among representatives, and events.

114.    As part of this campaign and a further inducement to potential representatives, WorldVentures made and disseminated Statements of compensation that further misled the public, among other things: (1) by using cryptic and technical terms known to WorldVentures but not to the general public or to those exploring the claimed "business opportunity," (2) by highlighting the "winners," *i.e.*, those that received compensation from WorldVentures, and the average gross compensation paid by WorldVentures to those winners, (3) by failing to disclose the actual number of "winners" as compared to the number of representatives who received no compensation from WorldVentures (i.e., the "losers"); and (4) by downplaying and omitting the risks and costs involved in starting an WorldVentures distributorship and succeeding in such a representative role.

115.    The touted "business opportunity" was only for a select few, and those that were recruited specially. And these numbers did not include expenses incurred by representatives in the operation or promotion of their businesses, meaning there were likely more net losers who made no profit at all.

116.    WorldVentures knew, or should have known, that the selective information presented to representatives in the Compensation and its massive adverting campaign during that time frame touting its purported "business opportunity" was likely to mislead the public and did in fact mislead the public into believing there was a legitimate "business opportunity" in which representatives, or a large portion of them, could make money in either a full or part time capacity. In fact, however, there was no such "business opportunity," except for a very select few.

117.    As a direct result of WorldVentures' fraudulent representations and omissions regarding the Statement and the massive adverting campaign during that time frame and thereafter touting WorldVentures' purported "business opportunity" described herein, WorldVentures wrongly acquired money from Plaintiff and the members of the classes.

118.    The named Plaintiff has standing to bring these Section 17200 claims under the fraudulent prong and can demonstrate actual reliance on the alleged fraudulent conduct.

119.    For instance, Plaintiff has been in receipt of misleading and false financial statements, which promoted the WorldVentures' scheme and claimed, "business opportunity" and contained materially false representations regarding the success representatives could achieve through WorldVentures by purchasing products and recruiting others to do the same.

120.    There were other representations made to representatives as part of the massive advertising campaign regarding the claimed "business opportunity," on which Plaintiff or some of the Class Members, reasonably believed the representations they could succeed in the "business opportunity," did not return the refund, purchased WorldVentures products and did not immediately return them, signed up as WorldVentures representatives, and attempted to and recruited others to do the same. These other representations include, but are not limited to the following:

a. Emails from WorldVentures that promoted WorldVentures and contained materially false representations regarding the success that a distributor could achieve through WorldVentures by purchasing products and recruiting others to do the same.

b. Websites, such as www.WorldVentures.com, which promoted the fraudulent scheme through videos of Directors containing materially false representations regarding the "business opportunity" available to representatives and the wealth that a distributor could get by agreeing to become an WorldVentures distributor.

c. Presentations by WorldVentures representatives which contained materially false representations regarding the "business opportunity" and the success that a distributor could get through WorldVentures by purchasing products and recruiting others to do the same.

d. Presentations by WorldVentures, including the presentations described in this

—

complaint, which contained materially false representations regarding the "business opportunity" and the success that a distributor could get through WorldVentures by

purchasing products and recruiting others to do the same.

e. Training and events where WorldVentures representatives made material false representations regarding the "business opportunity" and the success that a distributor could get through WorldVentures by purchasing products and recruiting others to do the same.

121.    To the extent proof of reliance is required of Plaintiff, WorldVentures and the Directors knew that Plaintiff and the class would reasonably rely on their representations and omissions, which would cause the Plaintiff and the class joining the fraudulent endless chain scheme and purchasing the products, and Plaintiff did in fact reasonably rely upon such representations and omissions.

122.    Indeed, had Plaintiff and the class known that WorldVentures and its Beneficiaries and Promoters were promoting an endless chain, they would not have become WorldVentures representatives in the first place and, if learned after becoming a distributor, they would not have purchased WorldVentures products thereafter.

123.    Had Plaintiff and the class known that WorldVentures was promoting a "business opportunity" that did not exist except for a select few, they would not have become WorldVentures representatives in the first place and, if learned after becoming a distributor, they would not have purchased WorldVentures products thereafter.

124.    Finally, the fraudulent acts, representations and omissions described herein were material not only to Plaintiff and the class (as described in this complaint), but also to reasonable persons. For instance, regarding the alleged "business opportunity" and representations in, and omissions from, the Statement, and on information and belief, a large percentage of individuals who signed up as WorldVentures representatives during this time frame expected that they could and would receive annual compensation at the approximate level of the "average earnings

compensation," in total, disclosed in the Statements of Average Gross Compensation. Unfortunately, no such large percentage could or did earn such an amount.

125.    Under California Business and Professions Code § 17200, a business practice is "unfair" if it violates established public policy or if it is immoral, unethical, oppressive, or unscrupulous and causes injury which outweighs its benefits.

126.    For the reasons set forth herein and above, WorldVentures' promotion and operation of an unlawful and fraudulent endless chain, and its fraudulent representations and omissions regarding its purported "business opportunity," "Packaging and Handling" fees, and FedEx freight fees are also unethical, oppressive, and unscrupulous in that WorldVentures is and has been duping Plaintiff and the class out of billions, or at least hundreds of millions, of dollars.

127.    WorldVentures' actions have few, if any, benefits. Thus, the injury caused to Plaintiff and the class easily and dramatically outweighs the benefits, if any.

128.    Defendants should be made to disgorge all ill-gotten gains and return to Plaintiff and the class all wrongfully taken amounts.

129.    Finally, Defendants' unlawful, fraudulent, and unfair acts and omissions will not be completely and finally stopped without orders of an injunctive nature. Under California Business and Professions Code section 17203, Plaintiff and the class seek a judicial order of an equitable nature against all Defendants, including, but not limited to, an order declaring such practices as complained of to be unlawful, fraudulent, and unfair, and enjoining them from further undertaking any of the unlawful, fraudulent, and unfair acts or omissions described herein.

## COUNT III

### (False Advertising - California Business and Professions Code § 17500, *et seq.*)

(On behalf of the Class and the Subclass against all Defendants, including DOES 1-1000)

130.    Plaintiff reallege all allegations and incorporates previous allegations by reference.

131.    All claims brought under this Third Claim for Relief that refer or relate to the false, untrue, fraudulent, or misleading endless chain of Defendants are brought on behalf of Plaintiff and the Class.

132.    All claims brought under this Third Cause of Action that refer or relate to the false, untrue, fraudulent, or misleading pre-February 2013 Statements of Average Gross Compensation and the touted WorldVentures "business opportunity" are brought on behalf of Plaintiff and the Pre-February 2013 Statement of Income.

133.    All claims brought under this Third Claim for Relief that refer or relate to the false, untrue, fraudulent, or misleading "Packaging and Handling" or FedEx freight fees before April 14, 2013, are brought on behalf of Plaintiff and the Packaging & Handling and FedEx Freight Subclass.

134.    Defendants' business acts, false advertisements and materially misleading omissions constitute false advertising, in violation of the California Business and Professions Code § 17500, et seq.

135.    Defendants engaged in false, unfair, and misleading business practices, consisting of false advertising and materially misleading omissions regarding the purported "business opportunity," likely to deceive the public and include, but are not limited to, the items set forth above. WorldVentures knew, or should have known, that the representations about the business opportunity of WorldVentures were misleading in nature.

136.    Because of Defendants' untrue and/or misleading representations, Defendants wrongfully acquired money from Plaintiff and the class members to which it was not entitled. The Court should order Defendants to disgorge, for the benefit of Plaintiff and all other WorldVentures representatives in the class who signed a Distributor Agreement with WorldVentures governed by California law their profits and compensation and/or make restitution to Plaintiff and the class.

137.    Under California Business and Professions Code Section 17535, Plaintiff and the class seek a judicial order directing Defendants to cease and desist from all false advertising related to the Defendants' illegal e scheme, and "Packaging and Handling" fee, and such other injunctive relief as the Court finds just and appropriate.

138.    Because of Defendants' untrue and/or misleading representations, Defendants wrongfully acquired money from Plaintiff and the class members to which they were not entitled.

The Court should order Defendants to disgorge, for the benefit of Plaintiff and all other WorldVentures representatives in the class who signed a Distributor Agreement with WorldVentures their profits and compensation and/or make restitution to Plaintiff and the class.

139.    Under California Business and Professions Code Section 17535, Plaintiff and the class seek a judicial order directing Defendants to cease and desist from all false advertising related to the Defendants' illegal scheme, and such other injunctive relief as the Court finds just and appropriate.

## COUNT IV

### (RICO 18 U.S.C. § 1962(a))

(On behalf of the Class and the Subclass against all Defendants, including DOES 1-1000)

140.    Plaintiff realleges all allegations as if fully set forth herein and incorporates previous allegations by reference.

141.    WorldVentures, Defendants, and others willfully and intentionally violated and continue to violate RICO and California law with the goal of obtaining money, directly and indirectly, through a pattern of racketeering activities in violation of the mail and wire fraud statutes,18 U.S.C. §§ 1341 and 1343, 18 U.S.C. § 1962(a), and California Penal Code § 327.

142.    WorldVentures has attempted to distinguish its business model from that of a pyramid scheme.

143.    WorldVentures has never systematically audited any income forms to ensure accuracy, and to ensure the business has legitimate retail sales.

144.    WorldVentures is aware that purchases of travel plans are done through its website and those internally in its organization almost completely, and thus its knowledge of the lack of legitimate retail sales revenue suggests its intent to continue operating a pyramid scheme.

145.    WorldVentures has no control in place to certify that at least 70 percent of travel packages purchased were either sold or consumed by a legitimate retail customer, and not by somebody who is a representative or distributor.

146.    WorldVentures does not track retail sales.

147.   WorldVentures could determine whether travel packages were purchased with end consumers, but does not do so.

148.   The refund policies are insufficient and do nothing to negate the fact that WorldVentures requires a monthly fee to paid to continue participation, which Plaintiff Yiru paid in this instance for several months.

149.   Third party Nugent characterizes himself as Co-Founder and CVO of WorldVentures on his social media page. Nugent had the power to direct the enterprises affairs at all times and had supervisory involvement.

150.   In 2018, Third Party Wayne Nugent was the keynote speaker encouraging individuals to sign up, all the while having knowledge that revenues are derived primarily from recruitment. https://www.youtube.com/watch?v=gHBn0OH3TEw.

151.   Third party Stammen has characterized himself as the CEO, the head position of the enterprise, and at other times Chief of Business Development. In 2018, Stammen was one of the keynote speakers for WorldVentures. https://www.youtube.com/watch?v=LX61SAgfqkg.

152.   WorldVentures is an enterprise on the brink of collapse in that it has failed to pay its distributors commissions that are owed. https://www.iol.co.za/sundaytribune/news/worldventures-sued-for-millions-by-reps-16636860.

153.   The Chinese Government cracked down on WorldVentures for illegally operating in the China, and sending international wires to the United States. https://www.mlmnewsreport.com/worldventures-bankrupt-distributors-resign-overunpaid-commissions/. Ultimately the illicitly obtained funds were siphoned to each of the Debtors and other DOE Defendants, except Azcue.

154.   In 2018, Government of Rwanda cautioned the public about Defendant WorldVentures operating illegally. https://www.newtimes.co.rw/news/governmentcautions-public-world-ventures.

155.   WorldVentures was told to cease operating in China, Malaysia, and Taiwan. http://amlmskeptic.blogspot.com/2015/04/old-news-world-ventures-busted-in-china.html.

156.    On or about January of 2018, the following report of an employee of Defendants was made at https://www.glassdoor.com/Reviews/WorldVentures-Holdingsbankruptcy-Reviews-EI_IE284228.0,22_KH23,33.htm:

1. COO resigned in less than 1 year, due to company planning for bankruptcy and financial trouble.

2. President of Sales and International Marketing, resigned, due to company's financial trouble and planning for bankruptcy.

3. Chief Security Officer resigned due to legal problems.

4. Smartcard have 15 developers from Flye CEO friend's organization without delivering anything but jobs of Full-time employees in CIO and CTO is in trouble.

5. HR asked every employee to sign "Conflict of Interest" document, where CEO of Flye (Old CTO of WV) have conflict of interest with 3 companies, not sure if they will request him to step down.

6. New CTO have 2 jobs. Not sure, where his loyalty lies.

157.    The named Debtors and other DOE Defendants, as promoters of the scheme, did not retain immediate control over the essential managerial conduct of the WorldVentures enterprise.

158.    Even if the Debtors and other DOE Defendants are no longer the CEO of WorldVentures, or head officers, the Debtors and other DOE Defendants functionally operate as lower rung participants or silent equity partners reaping a majority of the scheme's spoils, and receiving an infinite level deep, nearly all revenues from lower-level person's recruitments.  Since the Bankruptcy filings, very little has changed.

159.    Plaintiff's realization of profits was not inexplicably tied to the success of the promotional scheme.

160.    The distribution and sale of travel packages is not something the SEC has found amenable to regulation under the federal securities laws.

161.    The marketing and recruitment aspects of WorldVentures' enterprise are not within

the definition of a security.

162.   In the WorldVentures scheme, distributors themselves must recruit new participants.

163.   In the WorldVentures scheme, distributors themselves must recruit new participants in the travel package endless chain, primarily through their own recruiting and marketing activities.

164.   WorldVentures tells its distributors and the Plaintiff that they will have spent significant time, effort and work to earn money, WorldVentures attempts emphasize the retail aspects of the business, the promise of significant profits linked to becoming a distributor.

165.   WorldVentures characterizes its distributors as "independent contractors" in the purported distribution agreement it maintains on its website, negating the notion that the distributors are passive participants in the endless chain. 153. Plaintiff and the class of distributors, as reasonable consumers, were expected to contribute more than nominal and menial effort.

166.   Each of the Defendants are engaged in activities federal interstate and foreign commerce and are entities capable of holding a legal or beneficial interest in property.   All Defendant "persons," as that term is defined by 18 U.S.C. §1961(3).

167.   The Defendants together make up the "WorldVentures Enterprise" as an association of entities and individuals associated in fact to operate an illegal pyramid scheme. The WorldVentures Enterprise is not a legal entity within the meaning of "enterprise" as defined in 18 U.S.C. § 1961(4). The Defendants have been members of the WorldVentures Enterprise from at least April 2009 and continuing until the present. WorldVentures and the Beneficiaries and Promoters are separate entities from the WorldVentures Enterprise and play separate and distinct roles in the operation of the WorldVentures Enterprise.

   a.   WorldVentures is the founder, architect, and beneficiary of the WorldVentures Pyramid. Through interstate wire and mails, WorldVentures coordinates the WorldVentures Enterprise, a worldwide scheme. It also pays and awards the commissions, bonuses, and other incentives to the Defendants and others.

b.  WorldVentures employs the Defendant to coordinate operations of the WorldVentures Pyramid in the countries in which WorldVentures operates, including determining and coordinating points, bonuses, and other incentives.

c.  WorldVentures employs the other defendants as its operational arm of the WorldVentures Enterprise in the U.S. WorldVentures employs the other defendants to conduct racketeering activities in the U.S.

d.  WorldVentures employs the remainder of the Defendants to induce new recruits into the WorldVentures Pyramid, to induce representatives to purchase WorldVentures product, and to induce representatives to recruit additional representatives into the WorldVentures Pyramid. The Remaining Defendants also have an agreement with WorldVentures mandating that WorldVentures will not reform its fraudulent marketing plan without their consent.

168.   From at least April 2009 and continuing until the present, within the County of Los Angeles, and elsewhere, WorldVentures in association with the other defendants, did knowingly, willfully, and unlawfully conduct and participate, directly and indirectly, in the conduct of the affairs of the WorldVentures Enterprise through a pattern of racketeering activity.

169.   The alleged association exists for purposes other than simply to commit the predicate acts as defined in Plaintiff's RICO counts. Specifically, the Defendants formed the various entities and acted as separate individuals to earn money through selling legitimate travel packages. Thus, the association exists for purposes other than to commit the predicate acts.

170.   From at least April 2009 and continuing until the present, WorldVentures with each other and the remaining defendants, executed a per se scheme to defraud through a pattern of racketeering made up of distinct acts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343. The WorldVentures Enterprise engaged in and affected interstate and foreign trade. The WorldVentures Enterprise transacts business through the instrumentalities of interstate commerce such as telephones, facsimile machines, the internet, email, and the United States mail and interstate commercial carrier to communicate in furtherance of the activities of the WorldVentures

Enterprise.

171.    The WorldVentures Enterprise advertises, markets, and sells products and services throughout the United States. The operation of the enterprise continued over several years, including activities in every state, and has affected and damaged, and continues to affect and damage, commercial activity.

172.    To further the goals of the WorldVentures Enterprise, which were to (1) earn money through fraudulent means, (2) entice individuals to become WorldVentures representatives, (3) entice individuals to purchase products from WorldVentures; (4) entice individuals to recruit others to become WorldVentures representatives and profit off those recruits' purchases of WorldVentures products, and (5) reap large profits for themselves based on false representations, WorldVentures and the remaining defendants engaged in various forms of illegal activity, including (a) mail fraud, (b) wire fraud, and (c) conspiracy.

173.    The pattern of racketeering activity alleged is distinct from the WorldVentures Enterprise. Each act of racketeering activity is distinct from the WorldVentures Enterprise in that each is a separate offense committed by an entity or individual while the WorldVentures Enterprise is an association of entities and individuals. The WorldVentures Enterprise has an ongoing structure and/or organization supported by personnel and/or associates with continuing functions or duties.

174.    The racketeering acts set out above and below, and others, all had the same pattern and similar purpose of defrauding Plaintiff and the class for the benefit of the WorldVentures Enterprise and its members. Each racketeering act was related, had a similar purpose, involved the same or similar participants and methods of commission, and had similar results affecting Plaintiff and the class. The racketeering acts of mail and wire fraud were also related to each other in that they were part of the WorldVentures Enterprise's goal to fraudulently induce Plaintiff and the class to join the illegal scheme, purchase products, and recruit others to join the scheme.

175.    WorldVentures' and other Defendants' wrongful conduct has been and remains part of WorldVentures Enterprise's ongoing way of doing business and constitutes a continuing threat

to the property of Plaintiff and the class. Without the repeated acts of mail and wire fraud, the WorldVentures Enterprise's fraudulent scheme would not have succeeded.

176.    Revenue gained from the pattern of racketeering activity, which constitutes a significant portion of the total income of WorldVentures and the Beneficiaries and Promoters, was reinvested in the operations of the WorldVentures Enterprise for the following purposes: (a) to expand the operations of the WorldVentures Enterprise through additional false and misleading advertising and promotional materials aimed at recruiting new representatives; (b) to facilitate the execution of the illegal scheme; and (c) to convince current representatives to recruit new representatives, and purchase WorldVentures products.

177.    Yiru and the class were injured by the reinvestment of the racketeering income into the WorldVentures Enterprise because they invested billions of dollars of their own money through their purchasing of products, promotional materials, and WorldVentures products, all of which were packaged and shipped at inflated charges.

178.    In connection with promoting and executing their illegal scheme, members of the WorldVentures Enterprise knowingly and recklessly placed and caused to be placed in the United States mail or by interstate commercial carrier, or took or received therefrom, matters or things to be sent to or delivered by the United States mail or by interstate commercial carrier comprising, among other things product, invoices, letters, promotional materials, brochures, products and checks to Plaintiff and the class and received communications between and among themselves through the United States mail, in all fifty states and the District of Columbia. It was reasonably foreseeable that these mailings or receipts would take place in furtherance of the fraudulent scheme.

179.    In connection with promoting and executing their illegal scheme, members of the WorldVentures Enterprise engaged in wire fraud, in violation of 18 U.S.C. § 1343, by, among other things, knowingly and recklessly transmitting or causing to be transmitted with wire communications, in interstate and foreign trade, materials promoting the illegal WorldVentures Pyramid on internet web sites, radio, satellite radio, television, email, facsimile, telephone, and

text messages, including promotional materials, registration information, product information, and invoices. WorldVentures and the Directors maintain websites on the internet where the enterprise was perpetrated.

180.    WorldVentures' representatives can and do buy products and are given inducements to continue working as representatives within the WorldVentures Pyramid. WorldVentures maintains various websites hosting promotional videos featuring the Beneficiaries and Promoters promoting the unlawful scheme and other marketing materials featuring the Beneficiaries and Promoters promoting the illegal scheme. WorldVentures sent and received these interstate wire communications to and from all fifty states and the District of Columbia.

181.    Each Defendant has promoted the WorldVentures Pyramid and WorldVentures Enterprise. Each use of the mail or wire by Defendants and the Beneficiaries and Promoters done in furtherance of the WorldVentures Pyramid is an act of racketeering.

182.    The pattern of racketeering activity through which the affairs of the WorldVentures Enterprise were conducted and in which WorldVentures and the Beneficiaries and Promoters participated consisted of the following:

### Racketeering Act Number One

183.    In 2015, plaintiff Yiru received, through private commercial interstate carrier and the internet portal maintained by WorldVentures, certain application materials, which promoted the WorldVentures Enterprise and contained materially false representations regarding the success representatives could achieve through WorldVentures by purchasing travel packages and recruiting others to do the same.

184.    Because of her receipt of these materials, Plaintiff Yiru signed up with WorldVentures purchased WorldVentures travel packages and recruited others to do the same. The materials and package items were sent to Plaintiff Yiru with the purpose and intent of promoting the WorldVentures Enterprise's illegal scheme, all in violation of 18 U.S.C. § 1341.

### Racketeering Act Number Two

185.    In 2015, Plaintiff Yiru received, through private commercial interstate

carrier, and the internet portal maintained by the Defendants, a 2015 Annual Income Disclosure Statement, which promoted the WorldVentures Enterprise and the WorldVentures pyramid through the sales and marketing plan, and which contained materially false representations regarding the success that representatives could achieve through WorldVentures by purchasing travel packages and recruiting others to do the same.

186.     Because of her receipt of the representations, Plaintiff Yiru signed up with WorldVentures, purchased WorldVentures travel package, and recruited others to do the same. The Income Disclosure Statement with the purpose and intent of promoting the WorldVentures Enterprise's illegal scheme, all in violation of 18 U.S.C. § 1341.

### Racketeering Act Number Three

187.     In 2015 through 2016, Plaintiff Yiru ordered, through interstate wire transmissions over the internet travel packages, which were promoted by the WorldVentures Enterprise as the means by which representatives such as Yiru could "pay for their position" and get greater retail profits. WorldVentures hosted these websites. Yiru paid WorldVentures for these products using an electronic transfer of funds. WorldVentures shipped Yiru these products through private commercial interstate carrier. WorldVentures coordinated through interstate wires on at least a monthly basis following the order the collection and accruing of the rewards associated with those purchases. Because of the promised "rewards," "profits," and opportunity to advance up the WorldVentures Pyramid, Plaintiff Yiru purchased WorldVentures Products, paid for those WorldVentures travel packages, and received those products, using instrumentalities of interstate commerce. Defendants' actions violated 18 U.S.C. §§ 1341 and 1343.

### Racketeering Act Number Four

188.     Throughout April of 2009 and continuing, WorldVentures distributed information by interstate wire transmissions over the internet, such as www.WorldVentures.com, worldventuresfoundation.org. Yiru reviewed the website. The WorldVentures websites promoted the fraudulent scheme through videos of Directors containing materially false representations regarding the business opportunity available to representatives, and the wealth that a distributor

could get by agreeing to become an WorldVentures distributor. Because of the representations on WorldVentures' websites, Yiru became an WorldVentures distributor and maintained his position as an WorldVentures distributor and continued to order WorldVentures' products and recruit others to do the same. This violated 18 U.S.C. § 1343.

### Racketeering Act Number Five

189.    Throughout 2016, the members distributed information by interstate wire transmissions over the internet promoting WorldVentures as described in this Complaint. These videos promoted the fraudulent pyramid scheme and contained materially false representations regarding the wealth that a recruit or WorldVentures distributor could achieve if that recruit became an WorldVentures distributor and if a distributor purchased WorldVentures products. This violated 18 U.S.C. § 1343.

190.    WorldVentures' and the Directors' representations and omissions were the proximate cause of Yiru and the class joining the fraudulent scheme and purchasing the products.

191.    To the extent proof of reliance is legally required, in engaging in the aforementioned wire and mail fraud, WorldVentures and the Directors knew that Yiru and the class would reasonably rely on their representations and omissions which would cause the Plaintiff and the class joining the fraudulent pyramid scheme and purchasing the products.

192.    Defendants and the Directors knew that the misrepresentations and omissions described above in promoting and executing the fraudulent scheme were material because they caused Yiru and the class to join and participate in the illegal scheme.

193.    Had Yiru and the class known that WorldVentures and the Directors were promoting an illegal scheme, they would not have joined the WorldVentures Pyramid scheme.

194.    WorldVentures' and the Directors' acts of mail and wire fraud were a proximate cause of the injuries that Yiru and the class suffered. Because of WorldVentures' and the Directors' pattern of unlawful conduct, Yiru and the class lost millions of dollars, if not billions of dollars.

195.    Under 18 U.S.C. § 1964, Yiru and the class are entitled to treble their damages, plus

interest, costs and attorney's fees.

## COUNT V

## (RICO 18 U.S.C. § 1962(c))

(On behalf of the Class and the Subclass against all Defendants, including DOES 1-1000)

196.    Plaintiff realleges all allegations as if fully set forth herein and incorporates previous allegations by reference.

197.    WorldVentures, the Beneficiaries, and Promoters are associated with the WorldVentures Enterprise. In violation of 18 U.S.C. § 1962(c), WorldVentures and the Beneficiaries and Promoters conducted and/or participated in the conduct of the affairs of the WorldVentures Enterprise, including participation in activities in furtherance of the WorldVentures Defendants' fraudulent scheme, through the pattern of racketeering activity earlier alleged.

198.    As a direct and proximate result of WorldVentures' and the Beneficiaries' and Promoters' violation of 18 U.S.C. § 1962(c), Yiru and the class were induced to, and did, become representatives in the WorldVentures Pyramid scheme and purchased billions of dollars of the WorldVentures products and recruited others to do the same. Yiru and the class were injured by WorldVentures' and the Beneficiaries' and Promoters' unlawful conduct. The funds used to buy WorldVentures products constitute property of Yiru and the class within the meaning of 18 U.S.C. § 1964(c).

199.    WorldVentures knew of and agreed to the overall objective of the RICO offense because it knew the bonuses it toted were not possible, it knew the commission were not achievable, it knew that as much as 97-99% of distributors failed, and that income was derived not from customers, but from recruitments.

200.    Each of the Debtors and other DOE Defendants had a written and/or oral agreement with WorldVentures to commit each of the above predicate acts, in that there was an actual agreement between WorldVentures and each of the Debtors and other DOE Defendants that defined how each of the Debtors and other DOE Defendants would be making money from the

scheme, that such money would be based on the number of persons recruited into the scheme, and that salaries and bonuses would be tied to how many people were recruited into the network, as opposed to legitimately branching out into retail.

201.    Under 18 U.S.C. § 1964(c), Yiru and the class are entitled to treble their damages, plus interest, costs, and attorney's fees.

**COUNT VI**

**(RICO 18 U.S.C. § 1962(d))**

(On behalf of the Class and the Subclass against all Defendants, including DOES 1-1000)

202.    Plaintiff realleges all allegations as if fully set forth herein, and incorporates previous allegations by reference.

195.    Each of the Defendants was separate and distinct from the enterprise and they each carried out functions independently, attempting to create an air of propriety and success. WorldVentures and the Debtors and other DOE Defendants agreed to work together in a symbiotic relationship to carry on the illegal scheme. Under that agreement, WorldVentures, WorldVentures Holdings, WorldVentures Foundation, and the Directors and others conspired to violate 18 U.S.C. § 1962(a) and (c), in violation of 18 U.S.C. § 1962(d).

196.    As a direct and proximate result of WorldVentures' and the Directors' violation of 18 U.S.C. § 1962(d), Yiru and the class were injured by WorldVentures' and the Beneficiaries' and Promoters' unlawful conduct. The funds used to buy WorldVentures products constitute property of Yiru and the class under 18 U.S.C. § 1964(c).

197.    Under 18 U.S.C. § 1964(c), Yiru and the class are entitled to treble their damages, plus interest, costs, and attorney's fees

**COUNT VII**

**(DECLARATORY RELIEF 28 U.S.C. §§ 2201 *et seq*.)**

(On behalf of the Class and the Subclass against all Defendants, including DOES 1-1000)

198.    Plaintiff incorporates herein by reference paragraphs above as if they were set forth fully herein.

199.    This is a Count for declaratory relief brought pursuant to 28 U.S.C. §§ 2201 and

2202.

200.    28 U.S.C. §§ 2201 *et seq.* authorizes relief for any person who desires a declaration

of rights or duties with respect to one another. In cases of actual controversy relating to the legal

rights and duties of respective parties, such a person may seek a judicial declaration of his or her

rights and duties relative to an instrument or contract, or alleged contract, including a

determination of any question of construction or validity arising under the instrument or contract,

or alleged contract.

201.    On October 10, 2019, the Hon. Carlos G. Lopez (ret.) issued a Final Award (the

"Final Award") in arbitration case number 01-18-0004-3400, finding that the Representative

Agreement, the Policies and Procedures Manual, and the Compensation Guide were illusory, and

thus entirely unenforceable.

202.    On October 26, 2020, Judge Lopez issued an Amended Final Award in the

arbitration proceeding (the "Amended Final Award"). No party disputes the Amended Final

Award, and Plaintiff is moving to confirm the Amended Final Award.

203.    The Amended Final Award clarified (1) that typically arbitration agreements are

standalone from policies manuals, whereas WorldVentures did not do so, (2) that the

Representative Agreement, the Policies and Procedures Manual, and the Compensation Guide

comprised the entirety of the ("Agreement"), and (3) that the Final Award meant to apply the

finding only that the "arbitration provision" in the entire Agreement was illusory.

204.    Even though the Arbitrator clarified his ruling was not made as to other provisions

of the Agreement, the illusory ruling is subject to collateral estoppel because each and every

provision of the Agreement must be necessarily bound up in such a determination, and

WorldVentures is collaterally estopped and precluded from arguing that the choice of law

provision is enforceable based on the illusory finding related to the arbitration provision.

205.    Alternatively, the Final Award and Amended Final Award are subject to "law of

the case doctrine" in that a finding one provision is illusory cannot be divorced from the same

necessary finding that the balance of the Agreement's provisions are too, illusory.

206.     Even if the Defendants are not estopped or precluded based on law of the case or estoppel, Plaintiff seeks a declaratory judgment that the Agreement (which would include each and every provision, the choice of law provision, the so-called confidentiality provision) are unenforceable because the Agreement is illusory.

207.     Judge Lopez's ruling is at least persuasive as to such a determination.

208.     The entire Agreement is illusory because the unilateral amendment clauses are impermissible under law.

209.     The effect of a finding that an agreement is illusory under law, is that the entire contract is unenforceable.

210.     If the entire contract is unenforceable, the "choice of law" provision is enforceable and the "confidentiality" provision is unenforceable.

211.     Some of the Debtors and the DOE Defendants are not parties to the Agreement.

212.     The Individuals Defendants may not assert estoppel.

213.     The choice of law provision is narrow under 5th Circuit Authority, and thus does not reasonably include this dispute involving claims sounding in tort.

214.     A review of the choice of law provision of legitimate companies in Texas reflects as a matter of custom, practice, and performance that the choice of law provision here is narrow.

215.     An actual controversy exists between Plaintiff and Defendants as to their rights and duties to each other.  Specifically, the Defendants are now contending that one provision of the Agreement is not "illusory" even though another provision was found to be illusory, that the choice of law provision is broad, and that apparently the Debtors and other DOE Defendants can assert the choice of law. Plaintiffs contend that the choice of law provision is narrow, that illusory to one clause means illusory to all, and that the Debtors and other DOE Defendants have no basis to assert choice of law, as to a contract not referring to them.  Accordingly, a declaration is necessary and proper at this time.

216.     Plaintiff requests declaratory relief and a determination that the entire Agreement is illusory.

## **COUNT VIII**

**(Declaratory Judgment for Determination of Net Winner)**

217.    The Plaintiff realleges and repeats the allegations contained herein, and by reference incorporates them herein.

218.    The Plaintiff brings this action as a "defendant class action" pursuant to Federal Rules of Civil Procedure 23(a), (b)(1)(A), and (b)(1)(B) against a class (the "Net Winner Class") that the Debtors engaged in a Ponzi and pyramid scheme may be applied, along with any applicable presumptions, in determining the Plaintiff's claims.

219.    The named Defendants and DOE Defendants are Net Winners.

220.    The named and unnamed defendants were among the largest Net Winners of the Debtors' scheme and should be appointed, without cost to the Estates, as representatives of the Net Winner Class (the "Class Representatives").

221.    The Class Representatives will be adequate and appropriate representatives of the Net Winner Class in the course of and by virtue of their own defense to the same claims. Because they have substantially more (or certainly at least as much) incentive to vigorously defend against the Plaintiff's claims as any unnamed class member, these Defendants will fairly and adequately protect and represent the interests of the unnamed members of the Net Winner Class.

222.    The claims against and anticipated defenses of the Class Representatives are typical of the claims against and anticipated defenses of the unnamed members of the Net Winner Class. Like the Class Representatives, each of the unnamed members of the Net Winner Class participated in the Debtors' Ponzi and pyramid scheme and received more money than they paid during the course of their participation. The claims for return of "net winnings" against all the Net Winners are the same and should be calculated the same way for all class members.

223.    The nature of the defenses that may be asserted by the Class Representatives also would be the same, as liability for repayment of the fraudulent transfers made by the Debtors to the Net Winner Class does not depend on the personal circumstances of particular individuals (other than in the mathematical calculation of the amount of their liability, which will be resolved independently of the determination of liability).

224.     Prosecuting separate actions against individual class members would create a risk of inconsistent judgments with respect to individual class members

225.     Participants had multiple User Accounts, which can be identified to the Participant by, among other means, Common Identifiers. These multiple User Accounts of a Participant are hereinafter referred to as "Related User Accounts."

226.     The Plaintiff has determined the Net Winners by aggregating Related User Accounts to include money paid to the Debtors, international affiliated companies of the Debtors who were not joined to these bankruptcy cases, and DOE parties, received from the Debtors, and money paid to and received from other Participants in connection with the purchase or membership plans and travel Packages.

227.     The Plaintiff is entitled to a determination that the Debtors are operating a ponzi scheme and a pyramid scheme.

228.     The Plaintiff is entitled to a judgment declaring that a Net Winner is determined by aggregating Related User Accounts.

## COUNT IX
### (Fraudulent Transfer -- Constructive – 11 U.S.C. §§ 548(a)(1)(B), 550 and 551)

229.     The Plaintiff realleges and repeats the allegations contained in paragraphs 1 through 60 above and by reference incorporates them herein.

230.     Plaintiff seeks derivative standing to bring this claim.

231.     The Net Winner Payments were made within two years of the Petition Date.

232.     Each of the Net Winner Payments between the Debtors, international entities to whom the Debtor controls but who were not joined to the Bankruptcy Cases, and to DOES 1-1000, constitute a "transfer," as that term is defined in 11 U.S.C. § 548, of an asset or interest in an asset of the Debtors.

233.     Each Net Winner Payment was made for less than fair consideration.

234.     Each Net Winner Payment was made while the Debtors were insolvent, undercapitalized, or unable to pay their debts as they became due.

235.    Each of the Net Winner Payments constitutes a fraudulent transfer avoidable by the Plaintiff pursuant to § 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Defendants and members of the Net Winner Class pursuant to § 550(a) of the Bankruptcy Code.

236.    As a result of the foregoing, pursuant to §§ 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code, the Plaintiff is entitled to a judgment against the Defendants and each member of the Net Winner Class: (a) avoiding and preserving the Net Winner Payments, (b) directing that the Net Winner Payments be set aside, and (c) recovering the Net Winner Payments, or the value thereof, from the Defendants or members of the Net Winner Class for the benefit of the Estates.

## COUNT X
### (Fraudulent Transfer -- Actual – 11 U.S.C. §§ 548(a)(1)(A), 550, and 551)

237.    The Plaintiff realleges and repeats the allegations contained herein. Each of the Net Winner Payments to the Debtors, affiliates who are not in Bankruptcy, and DOES-1000, was made on or within two years before the commencement of these Chapter 11 cases.

238.    Plaintiff seeks derivative standing to bring this claim.

239.    Each of the Net Winner Payments constitutes a "transfer," as that term is defined in 11 U.S.C. § 548, of an asset or interest in an asset of the Debtors.

240.    Each of the Net Winner Payments was made with the actual intent to hinder, delay or defraud some or all of the Debtors' then existing and/or future creditors.

241.    Each of the Net Winner Payments constitutes a fraudulent transfer avoidable by the Plaintiff pursuant to 11 U.S.C. § 548(a)(1)(A) and recoverable from the Defendants pursuant to §§ 550(a) and 551 of the Bankruptcy Code.

242.    As a result of the foregoing, pursuant to 11 U.S.C. § 548, the Plaintiff is entitled to a judgment against the Defendants and members of the Net Winner Class: (a) avoiding and preserving the Net Winner Payments, (b) directing that the Net Winner Payments be set aside, and (c) recovering the Net Winner Payments, or the value thereof, from the Defendants and the members of the New Winner Class for the benefit of the Estates.

## COUNT XI
### (Preferences – 11 U.S.C. §§ 547, 550 and 551)

243.    The Plaintiff realleges and repeats the allegations contained above and by reference incorporates them herein.

244.    Plaintiff seeks derivative standing to pursue this claim.

245.    Certain members of the Net Winner Class received more payments from the Debtors (whether from payments directly from the Debtors or from international transactions) than they paid (whether from payments to the Debtors or through Triangular Transactions) within ninety (90) days of the commencement of these cases (the "Net Preference Payment").

246.    To the extent a Defendant received Net Preference Payments of not less than $6,225, such payments were made:

> (a) to or for the benefit of the Defendant, who claims to be a creditor at the time of the transfers;
> (b) for or on account of an antecedent debt owed by the Debtors before such transfer was made;
> (c) while the Debtors were insolvent;
> (d) within 90 days (within one year) of the petition date; and
> (e) enabling the Defendant to receive more than a creditor would receive if the case was one under Chapter 7, the transfer was not made and the Defendant received payment of such debt to the extent provided by the provisions of Title 11 of the United States Code.

247.    The Net Preference Payments, to the extent totaling at least $6,225 as to each Defendant, may be avoided as a preferential transfer pursuant to 11 U.S.C. § 547 and recovered from the Defendants pursuant to 11 U.S.C. § 550, and 551.

248.    The Plaintiff is entitled to a judgment against the Defendants, affiliated international entities and DOES 1-1000: (a) avoiding and preserving the Net Preference Payments, (b) directing that the Net Preference Payments be set aside, and (c) recovering the Net Preference Payments, or the value thereof, from the Defendants and the members of the New Winner Class for the benefit of the Estates.

## COUNT XII
### (Declaratory Judgment)

249.    The Plaintiff realleges and repeats the allegations contained above.

250.    Upon a judgment that the Net Winner Payments and Net Preference Payments are recoverable by the Plaintiff Class (or on behalf of the estate), the Plaintiff requests that the Court enter an order determining the calculation of the liability of the Defendants and each member of the Net Winner Class to the Plaintiff.

251.    The Plaintiff requests the Court determine that the following constitute an appropriate procedure for determination of monetary liability:

a.   The Plaintiff submits to each Defendant and each member of the Net Winner Class a statement setting forth:

   i.    A listing of all User Accounts identified to each Defendant or member of the Net Winner Class as a Related User Account,

   ii.    A summary of the transactions within each Related User Account,

   iii.    The net amount due based upon an aggregation of the Related User Accounts;

b.   Each Defendant and member of the Net Winner Class shall respond within forty-five (45) days if he/she disagrees with the Plaintiff's statement of the Net Winner Payment or Net Preference Payments, and if so, provide a detailed statement of the basis of the disagreement;

252.    If no timely objection is submitted, the Court shall enter judgment for the amount of the statement.

253.    If a timely objection is filed, the amount of the judgment shall be determined by the Court.

## COUNT XIII
### (Disallowance of Claims Pursuant to 11 U.S.C. §502(d))

254.    The Plaintiff realleges and repeats the allegations contained in the above paragraphs, and by reference incorporates them herein.

255.    Pursuant to 11 U.S.C. §502(d), the Court shall disallow any claim of a Net Winner from whom property is recoverable under Section 550 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under Sections 547 or 548 of the Bankruptcy Code, unless such Net Winner has paid the amount or turned over any such property for which the Net Winner is liable under Section 550.

256.    Creditors have standing to object to the claim of other purported "creditors."

257.    To the extent a Net Winner fails to pay to the estate a Net Winner Payment or Net Preference Payment, any claims of such Net Winner in these bankruptcy cases shall be disallowed without further order of Court.

## PRAYER FOR RELIEF

The named Plaintiff and the Plaintiff class and subclass request the following relief on the pyramid claims:

a.    Certification of the class and subclasses;

b.    A jury trial and judgment against Defendants;

c.    Rescission of the agreements upon which the scheme is based, and recovery of all consideration paid pursuant to the scheme, less any amounts paid or consideration provided to the participant pursuant to the scheme;

d.    Damages for the financial losses incurred by Plaintiff and by the class and subclasses because of the WorldVentures Defendants' conduct and for injury to their business and property;

e.    Restitution and disgorgement of monies;

f.    A judicial declaration that the entire Agreement is illusory, and thus unenforceable;

g.    Temporary and permanent injunctive relief enjoining WorldVentures from paying its Representatives recruiting rewards that are unrelated to retail sales to ultimate users and from further unfair, unlawful, fraudulent and/or deceptive acts;

h.    The cost of suit including reasonable attorneys' fees under California Code of Civil Procedure § 1021.5, Civil Code §1689.2, and otherwise by law;

i.    Trebling of damages;

j.    Punitive damages;

k.    For damages in an amount yet to be ascertained as allowed by law; and

l.    For such other damages, relief and pre- and post-judgment interest as the Court may deem just and proper.

The named Plaintiff and the Plaintiff class and subclass request the following relief on the ponzi claims:

a. Enter declaratory judgment in favor of the Trustee that a Net Winner is to be determined in accordance with the methodology set forth above.

b. Pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code: (a) avoiding and preserving the Net Winner Payments, (b) directing the Net Winner Payments be set aside and (c) recovering the Net Winner Payments from the Defendants and each member of the Net Winner Class for the benefit of the Estates.

c. Pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code: (a) avoiding and preserving Net Winner Payments, (b) directing the Net Winner Payments be set aside and (c) recovering the Net Winner Payments from the Defendants and each member of the Net Winner Class for the benefit of the Estates.

d. Pursuant to 11 U.S.C. § 547, (a) avoiding Net Preference Payments received by each Defendant and each member of the Net Winner Class as preferential payments, to the extent such payments total at least $6,225, and (b) recovering such payments for the benefit of the Estates.

e. Disallowing the claims of any Net Winner who does not pay a Net Winner Payment or Net Preference Payment, in accordance with 11 U.S.C. §502(d).

f. And for such other and further relief as this Court deems just and proper.

DATED: August 2, 2021                    Respectfully submitted by:

                                         /s/ *Blake J. Lindemann*
                                         Blake J. Lindemann
                                         California Bar No. 255747
                                         E-mail:  blake@lawbl.com
                                         **LINDEMANN LAW FIRM, APC**
                                         (*pro hac vice*)
                                         433 N. Camden Drive, 4th Floor
                                         Beverly Hills, CA 90210
                                         Telephone No: 310-279-5269
                                         Facsimile No: 310-300-0267

                                         -and-

                                         Rachel E. Montes
                                         Texas Bar No. 45005925
                                         Rachel@MontesLawGroup.com
                                         **MONTES LAW GROUP, PC**
                                         1121 Kinwest Parkway, Ste. 100
                                         Irving, TX 75063
                                         Telephone No: 214-522-9401
                                         Facsimile No: 214-522-9428


                                         COUNSEL FOR CREDITOR MELODY YIRU
                                         AND THOSE SIMILARLY SITUATED

## DEMAND FOR JURY TRIAL

Plaintiff Melody Yiru on behalf of herself and those similarly situated, hereby requests a jury trial on all matters so triable.


DATED: August 2, 2021                    Respectfully submitted by:

                                         /s/ *Blake J. Lindemann*
                                         Blake J. Lindemann
                                         California Bar No. 255747
                                         E-mail:  blake@lawbl.com
                                         **LINDEMANN LAW FIRM, APC**
                                         (*pro hac vice*)
                                         433 N. Camden Drive, 4th Floor
                                         Beverly Hills, CA 90210
                                         Telephone No: 310-279-5269
                                         Facsimile No: 310-300-0267

                                         -and-

                                         Rachel E. Montes
                                         Texas Bar No. 45005925
                                         Rachel@MontesLawGroup.com
                                         **MONTES LAW GROUP, PC**
                                         1121 Kinwest Parkway, Ste. 100
                                         Irving, TX 75063
                                         Telephone No: 214-522-9401
                                         Facsimile No: 214-522-9428


                                         COUNSEL FOR CREDITOR MELODY YIRU
                                         AND THOSE SIMILARLY SITUATED